IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ELDER SAAVEDRA, | § | |
| | § | No. 165, 2019 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID No. N1705014681 |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: November 13, 2019
Decided:  January 30, 2020

Before **SEITZ,** Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court of the State of Delaware.  **AFFIRMED**.

Michael W. Modica, Esquire, Wilmington, Delaware, *for Appellant Saavedra.*

Brian L. Arban, Esquire Department of Justice, Wilmington, Delaware, *Appellee State of Delaware.*

**TRAYNOR**, Justice:

A Superior Court jury convicted Elder Saavedra of the first-degree murder of Lester Mateo and possession of a deadly weapon during the commission of a felony. The court sentenced Saavedra to life in prison for the murder conviction and ten years in prison for the weapons charge.

In this direct appeal, Saavedra argues that his convictions should be overturned because of the prosecutor's misconduct and the trial court's erroneous admission of evidence during his trial. His principal complaint relates to the chief investigating officer's narrative testimony during the prosecution's display of numerous video clips that, it claimed, showed Saavedra exiting a nightclub, getting behind the wheel of a large sport utility vehicle, and driving that SUV into Mateo, killing him. He claims that the prosecution used the officer's narration as a vehicle for the admission of improper identification testimony and otherwise inadmissible hearsay.

Saavedra also contends that the trial court abused its discretion by allowing another officer to offer lay opinion testimony under D.R.E. 701 regarding the meaning of a phrase uttered in Spanish by Saavedra at the scene, when, according to Saavedra, the opinion was not "rationally based on the witness's perception." And finally, Saavedra asserts that the prosecutor engaged in misconduct when he asked

2

a question that implied that the witness—despite his denial—had identified Saavedra in a video clip during a pretrial interview.

Although Saavedra has raised some legitimate concerns regarding the officer's narrative testimony that accompanied the important video evidence, we disagree with his conclusion that the admission of that testimony, much of which came in without objection and was the subject of two curative instructions, is grounds for reversal. Nor are we persuaded that the challenged opinion testimony and the prosecutor's question that purportedly implied a fact that was not supported by the evidence affected the fairness of Saavedra's trial. Therefore, we affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

On the evening of March 25, 2017, Lester Mateo, accompanied by several friends, drove a Cadillac Escalade belonging to a friend's sister to a nightclub in Bear, Delaware called El Nuevo Rodeo. As the evening passed into the early morning hours of March 26, Elder Saavedra, who was at the club with his brother, Carlos, and his cousin, Brian, started a scuffle on the club's dance floor by shoving one of Mateo's friends, Yosimar DeLeon-Lopez. The nightclub's security staff quickly moved to separate Saavedra and his friends from DeLeon-Lopez, Mateo, and their friends, escorting the latter group out the club's front door while Saavedra's group was escorted out a side door. As DeLeon-Lopez was leaving the club through its main door, he saw the person who had pushed him on the dance floor and heard

3

him say: "Guatemala"—an apparent reference to Mateo's group—"is going to die."[1] DeLeon-Lopez later identified Saavedra in a photographic lineup conducted at the police station as the man who pushed him and confirmed that identification at trial. Two other witnesses—Irwin Ramirez-Recinos and Fernando Castillo de Leon—also identified Saavedra as the person who started the scuffle on the dance floor. Witnesses described Saavedra's demeanor variously as "insult[ing],"[2] "mad and drunk,"[3] and itching for a fight.

After the altercation, Mateo, who was his group's designated driver, walked hurriedly and then ran to the Escalade, got in, and drove it to the edge of the parking lot near the east end of the building. For reasons that are unclear, Mateo then got out of the vehicle, with the engine running and the front driver's side door open, and began to walk toward the nightclub's entrance. But he didn't get far. Almost immediately, two individuals from Saavedra's group, Brian Saavedra and Carlos Saavedra, began to chase him, belts and buckles in hand. A doorman came to Mateo's aide by spraying the two pursuers with pepper spray. But Mateo was not out of harm's way. Another individual, ultimately identified by Madelyn Aramiz as Elder Saavedra, had hopped into the running Escalade and now pointed it in Mateo's direction. Try as he might to evade the speeding Escalade, Mateo was unable to get

---

[1] App. to Opening Br. at A44.
[2] App. to Answering Br. at B31.
[3] *Id.*

4

away. Saavedra caused the Escalade to leap a curb and then accelerated, ramming the vehicle violently into the fleeing Mateo resulting in his death from blunt force injuries.

The police arrived at the scene within a matter of minutes. Detective Scott Mauchin of the Delaware State Police, who was designated as the chief investigating officer, arrived approximately one hour later and began the process of identifying and interviewing witnesses and gathering surveillance video evidence, which, as will be discussed in detail later, was extensive.

One of the witnesses who came forward was Madelyn Aramiz. Ms. Aramiz had been at El Nuevo Rodeo that evening since it opened at 9:00, but in the ensuing four hours she had only "one drink and that was it."[4] Around 1:00 a.m., Aramiz "noticed the security guards running to an area,"[5] which she interpreted as some sort of trouble brewing so, being tired anyway, she decided to leave the club and wait in her cousin's van for her cousin who was dancing. Shortly after entering the van, she heard what she described as a "scuffle" behind it.[6] She looked out and noticed a person walking "alongside . . . [a] black car."[7] She watched from two parking spaces away as that person, who "looked spooked,"[8] turned to run. But, as she put it, "the

---

[4] *Id.* at B39.
[5] *Id.*
[6] *Id*. at B40.
[7] App. to Opening Br. at A67.
[8] *Id.* at A68.

truck floored it and ran right in [to him]."[9]  Her conclusion that "the truck floored it" was based on how loud the engine sounded.[10]

Aramiz immediately looked at the person who was driving the truck.[11]  She watched as the driver opened the door of the truck.[12]  At trial, she described what she saw next:

> I saw him jump out.  I saw him jump out of the driver's side. And then he proceeded to run.  But he stood directly in front of the van that I was sitting in pretty much.  And he stood there.  He had a belt wrapped around his hand with a big buckle.  He stood there for a few seconds.  And then he kind of smirked and did a little hippity-hop.  And then he said "la migra."  And then he ran off.[13]

Aramiz waited for a security guard to arrive before getting out of the van.  She told the guard that "there was someone lying there [and] that he was probably dead."[14]  She then called 911.  She spoke to the police initially at the scene, but it is unclear what she told them at the time.  We do know, however, that she met with the police later that week and picked a photograph of Elder Saavedra out of a photographic lineup, identifying him as the person she saw getting out of the vehicle after it struck Lester Mateo.

---

[9] *Id.*.

[10] *Id.*

[11] *Id.* at A68–69.

[12] *Id.* at A69.

[13] *Id.*  A review of the video evidence suggests that Aramiz was mistaken and that Saavedra was not wielding his belt as a weapon.  That same evidence, however, shows Saavedra's two companions, Brian and Carlos Saavedra, holding their belts as if they intended to use them aggressively.

[14] *Id.* at A70.

Although the police secured these identifications of Elder Saavedra during the week following Mateo's death—by Yosimar DeLeon-Lopez, Irwin Ramirez-Recinos, and Fernando Castillo de Leon as the instigator of the dance-floor altercation and by Madelyn Aramiz as the driver of the Cadillac Escalade that caused Mateo's death— Saavedra was not arrested for several weeks following the crime. That is because Saavedra left Delaware ostensibly to evade detection and arrest. According to cell-tower location information obtained through a search warrant, Saavedra's cell phone connected to a cell tower in North Carolina approximately seven hours after the collision in the dance club parking lot. A day and a half later, according to the cell phone call detail records, Saavedra was in New York City.

Other evidence tended to show that Saavedra was fleeing the consequences of his actions at El Nuevo Rodeo. For instance, having never missed a paycheck in the three and one-half years during which he worked for a local commercial office furniture company, Saavedra "stopped showing up for work" on March 27 according to the company's owner, leaving two paychecks unclaimed.[15]

A former girlfriend of Saavedra's, Mariela Conejo-Cintura, provided additional insight into his activities and state of mind in the wake of Mateo's death. Conejo-Cintura was in El Nuevo Rodeo and saw Saavedra "fighting with [the]

---

[15] *Id.* at A107–10.

friends, family of the boy- - the guy,"[16] but she didn't see how the fight started. She had no direct contact with Saavedra until later that morning after El Nuevo Rodeo had closed. As she was driving home after dropping off friends, Saavedra called her on her cell phone. Saavedra told Conejo-Cintura that he needed her help and implored her to come to his apartment across the river in Swedesboro, New Jersey. She complied, and when she arrived at the apartment, she found Saavedra acting in a "strange" manner, "mad" and "nervous."[17] Saavedra left the area of the Swedesboro apartment without telling Conejo-Cintura what exactly it was that he needed, and she did not ask because, according to her, "when you ask [questions of Saavedra], he gets really upset and comes at people."[18]

"[D]ays later"[19]—the record does not say how many—Conejo-Cintura returned to Saavedra's Swedesboro apartment at Saavedra's request, but he was not there—nor was his bed, furniture, or living room table. The apartment was otherwise in disarray with "a lot of stuff . . . and boxes open everywhere."[20] This surprised Conejo-Cintura, because she always knew Saavedra to keep a clean, orderly, and well-furnished apartment.

---

[16] *Id.* at A91.
[17] App. to Answering Br. at B110.
[18] *Id.* at B111.
[19] *Id.* at B112.
[20] *Id.* at B113.

The next time Conejo-Cintura saw Saavedra was at her home in Delaware. After asking Conejo-Cintura if she had heard any rumors about what happened that night at El Nuevo Rodeo, Saavedra once again asked for help, saying that he needed to buy a car so he could leave the country. Conejo-Cintura, fearful that Saavedra would do harm to her—he "threatened [her] with death"[21]—answered Saavedra's demands by helping find a car and signing for the loan.

Several days later—once again, we are not certain how many—Saavedra returned to Conejo-Cintura's house, this time in the car she had purchased for him. And on this occasion, Saavedra told Conejo-Cintura what happened "on the night of the rodeo." Saavedra confessed:

> [t]hat he got possessed by the devil and killed somebody that night and he didn't want to do it, and that he was going to finish the rest of the rats, the Guatemalans that he doesn't like.[22]

Saavedra also told Conejo-Cintura that, because she now knew what happened, if anything happened to him, she would be guilty too. Saavedra was arrested on May 5, 2017 and charged with murder in the first degree and possession of a deadly weapon—the Cadillac Escalade—during the commission of a felony.[23]

---

[21] *Id.* at B117.

[22] *Id.*

[23] Sept. 17, 2018 Trial Transcript at 53; Answering Br. at 16.

At his trial, the evidence was overwhelming—and Saavedra did not appear to contest—that he was the instigator of the dance-floor scuffle.[24] And surveillance video clips, collected from numerous camera angles, captured—with varying degrees of clarity—much of what occurred after the two contending groups were expelled from the club.

In the State's opening statement, the prosecutor played some of the video clips for the jury and identified Lester Mateo and Elder Saavedra, among others, from the time they left the club to the moment of the fatal collision. During this display, after specifically pointing out Saavedra, the prosecutor invited the jury to "watch . . . and track the defendant."[25] Saavedra did not object. The prosecutor also played a video showing Madelyn Aramiz walking to her van shortly before the collision and described her identification of Saavedra in the photographic lineup.

For his part, Saavedra's opening statement was short (covering five transcript pages) and relatively benign. He did, however, remind the jury that, despite the prosecutor's identification of Saavedra in the video clips during opening statements, whether that identification was accurate was for the jury to decide. Saavedra also suggested that Madelyn Aramiz's identification was unreliable.

---

[24] In closing argument, Saavedra's counsel attempted to downplay the significance of the scuffle, calling it a "non-fight." September 17, 2018 Trial Transcript 101.
[25] Sept. 10, 2018 Trial Transcript.

The jury heard the testimony of fourteen witnesses, all of whom were called by the State. Saavedra chose not to present any evidence. Not surprisingly, one of the major thrusts of Saavedra's closing argument was an attack on Aramiz's credibility.[26] But notably—especially in light of Saavedra's arguments before us—Saavedra paid scant attention in closing to the video evidence and whether it supported the State's contention that Saavedra was the driver who killed Mateo.

As mentioned, after the jury found Saavedra guilty of murder in the first degree and possession of a deadly weapon during the commission of a felony, the Superior Court sentenced Saavedra to life plus ten years in prison.

## II. SAAVEDRA'S CONTENTIONS ON APPEAL

Saavedra makes three arguments on appeal. First, he claims that the prosecutor engaged in prosecutorial misconduct by impermissibly eliciting the narration of the critical surveillance videotapes. According to Saavedra, the manner in which the prosecutor questioned the chief investigating officer during the playback of the video for the jury manifested an intent to call forth inadmissible hearsay and improper identifications. Saavedra also appends a claim to this argument that the "enhancing" of one of the videos was improper.

---

[26] Saavedra's counsel went so far as to call Aramiz a liar, prompting a curative instruction from the trial judge.

11

Second, Saavedra contends that the Superior Court abused its discretion by allowing a police witness of Hispanic descent to testify regarding the meaning, beyond a literal translation, of the phrase "la migra"—a phrase an important eyewitness said she heard Saavedra utter as he fled the scene. The State offered, and the court admitted, the testimony as a lay opinion under Rule 701 of the Delaware Rules of Evidence ("D.R.E."), which Saavedra says was error.

Third, Saavedra argues that the State engaged in prosecutorial misconduct when the prosecutor asked a question of a recalcitrant witness implying that the witness had previously identified Saavedra in a video, after the witness had denied doing so.

## III. STANDARD OF REVIEW

When we consider prosecutorial-misconduct claims, our standard of review frequently depends on whether the defendant objected to the alleged misconduct at trial. If the defendant did not object, this Court reviews only for plain error; if he did object, then we review for harmless error.[27]

Because the scope of Saavedra's prosecutorial misconduct claims is unclear—some aspects of it appear to have been raised below while others were not—it is appropriate here to describe the difference between harmless-error and plain-error review of a prosecutorial misconduct claim. Under both standards, we first engage

---

[27] *Baker v. State*, 906 A.2d 139, 148 (Del. 2006).

12

in a *de novo* review to determine whether the prosecutor's actions rise to the level of misconduct.[28]  If we decide that no misconduct occurred, the analysis ends; only if we find misconduct do we proceed to the plain error and harmless error analysis.[29]

If we find misconduct and the claim was not fairly considered below because a timely objection was not made and the judge failed to address the conduct *sua sponte*, we engage in a plain error analysis and apply the standard announced in *Wainwright v. State*,[30] to determine whether the error complained of is so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process.[31]  According to *Wainwright*,

> the doctrine of plain error is limited to material defects which are apparent on the face of the record[,] which are basic, serious[,] and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice.[32]

If we find plain error under the *Wainwright* standard, we reverse.

Where, on the other hand, defense counsel raised a timely objection to the prosecutorial misconduct at issue or if the trial judge addressed the issue *sua sponte*, we review for harmless error.  In *Baker v. State*, then-Chief Justice Steele aptly described our harmless-error analysis as applied to prosecutorial misconduct:

---

[28] *Id.* at 149–50.
[29] *Id.*
[30] 504 A.2d 1096 (Del. 1986).
[31] *See Baker*, 906 A.2d at 150.
[32] *Wainwright*, 504 A. 2d at 1100.

If . . . we determine that the trial prosecutor did engage in misconduct, we move to the second step in the analysis, because not every instance of prosecutorial misconduct requires reversal. Only improper comments or conduct that prejudicially affect the defendant's substantial rights warrant a reversal of his conviction. To determine whether prosecutorial misconduct prejudicially affects a defendant's substantial rights, we apply the three factors of the *Hughes* test, which are: (1) the closeness of the case, (2) the centrality of the issue affected by the error, and (3) the steps taken to mitigate the effects of the error. The factors in the *Hughes* test are not conjunctive and do not have the same impact in every case; for example, one factor may outweigh the other two. Moreover, we apply the test itself in a contextual, case-by-case, and fact sensitive manner. [33]

If we conclude that prosecutorial misconduct has occurred but that reversal is not warranted because of the failure to meet the *Wainwright* standard under plain-error review or the *Hughes* standard under harmful-error analysis, we proceed to yet another analytical step in accordance with our decision in *Hunter v. State*.[34] Under *Hunter*, even where we are unable to conclude that the prosecutor's misconduct was so prejudicial as to compromise the fairness of the trial process, we may yet reverse where the misconduct is part of a "persistent pattern of prosecutorial misconduct" over different trials such that a failure to reverse would compromise the integrity of the judicial process.[35] "Under the *Hunter* test we *can* reverse, but need not do so,"[36] especially where other ways of dealing with the misconduct such as a referral to the

---

[33] *Baker*, 906 A.2d at 148–149 (citations omitted); *see also Hughes v. State*, 437 A.2d 559 (Del. 1981).
[34] *Hunter v. State*, 815 A.2d 730 (Del. 2002).
[35] *Id.* at 737–38.
[36] *Baker*, 906 A.2d at 149 (emphasis in original).

Attorney General for internal discipline or to the Office of Disciplinary Counsel are more appropriate.

## IV. ANALYSIS

A. *Testimony Relating to Video Presentation—Prosecutorial Misconduct*

As mentioned, the immediate prelude to the fatal collision and the actual collision itself were captured by surveillance video cameras. Most of the video images, especially those showing Saavedra angrily walking away from the nightclub and those that captured the Escalade striking Mateo, are remarkably clear. Others, including the portion of one video clip depicting Saavedra getting into the Escalade before the collision and fleeing from it afterwards are considerably less clear. All told, the State moved twenty separate video DVDs into evidence and played all of them for the jury during its case-in-chief. Saavedra now raises a multitude of arguments relating to the manner in which the prosecution presented this video evidence. He leads with his claim that the prosecutor engaged in misconduct by asking questions of the chief investigating officer that elicited inadmissible testimony during the video presentation and follows with the contention that one of the videos was improperly "enhanced."[37]

---

[37] Opening Br. at 2, 27–2 8.

Saavedra claims that the prosecutor engaged in misconduct when he "impermissibly elicit[ed] [the] improper narration of [the] surveillance videotapes"[38] by Detective Mauchin. He claims—if we understand his argument correctly—that, although the questions asked by the prosecutor were not in themselves improper, the prosecutor's *purpose* in asking them was to elicit an improper identification of Saavedra as well as inadmissible hearsay. He further contends that, because several instances of Detective Mauchin's purportedly prejudicial and inadmissible testimony came after the trial judge directed Detective Mauchin to "refrain from making any type of identification of the defendant,"[39] the questions that elicited the responses were asked in disregard of the trial court's instructions.

Although we do not condone the use of narrative testimony during a video presentation to a fact finder beyond what is necessary to lay the foundation for the video's admission and to present an uncontroversial explanation of what the video depicts, we are satisfied, after a careful review of the prosecutor's examination of Detective Mauchin—especially the uninterrupted examination on the first day of trial—that the prosecutor cannot fairly be charged with misconduct.

According to Saavedra, the alleged misconduct and improper identifications occurred on the fourth day of trial. But that was not Detective Mauchin's first day

---

[38] *Id.*
[39] App. to Opening Br. at A112.

on the witness stand. In fact, Detective Mauchin had testified and was subject to cross-examination on the first trial day, after which eight other witnesses testified, including security personnel from El Nuevo Rodeo, Irwin Ramirez-Recinos, Yosimar DeLeon-Lopez, Fernando Castillo de Leon, Brian Saavedra, and Madelyn Aramiz. Detective Mauchin was also recalled on the third day of trial for testimony relating to his participation in the search of two residences with which Saavedra was connected.[40] Then, on the fourth day of trial, Detective Mauchin was recalled. Saavedra's prosecutorial-misconduct claim focuses on this third round of the detective's testimony. But to fairly assess the propriety of the prosecutor's direct examination the third time around, we must first understand the evidence that had been presented up to that point—without objection—and especially what Detective Mauchin had already told the jury.

During Detective Mauchin's testimony on the first day of trial, the State moved the admission of seventeen video exhibits collected from more than a dozen surveillance cameras. At first, the detective identified the different cameras by number and described the areas outside El Nuevo Rodeo captured by each camera,

---

[40] At the home of Mariela Conejo-Cintura (Saavedra's former girlfriend) at which, it was learned, Saavedra had stored some of his property, police seized a shirt that the State contended Saavedra was wearing on the night of Mateo's death. During this testimony, Mauchin compared the shirt to a still photo (State's Ex. No. 24) developed from the video that was admitted as State's Ex. No. 7.

noting that certain camera angles were more helpful than others "because they showed all the parties involved . . . [and] their movements."[41]

The prosecution, without objection, then began to play the video clips for the jury as Detective Mauchin was questioned. Here are some representative—and particularly relevant—examples of the interplay between the video clips and Mauchin's testimony:

> Q. What is significant, why did you pull this camera angle [camera two] in this clip?
>
> A. Primarily because you could see the victim, Lester Mateo, from this camera angle.[42]
>
> * * *
>
> Q. What are we looking at here? What are we looking at with respect to Lester?
>
> A. The Guatemalan group are talking with the security guards out front, and they're explaining to them or trying to at least explain to them as to what happened inside the club.[43]
>
> * * *
>
> Q. What are we looking at here?
>
> A. This is Lester Mateo. He just walked away from the front door. Now he's running down the alley. He's in [*sic*] route to actually get the Escalade.[44]
>
> * * *
>
> Q. Why was this collected?

---

[41] App. to Answering Br. at B6.
[42] *Id.* at B7 (referring to State's Ex. No. 2).
[43] *Id.*
[44] *Id.* at B8 (referring to State's Ex. No. 3).

18

A. This is the Cadillac Escalade as Lester Mateo is driving it, towards that side parking lot.[45]

\* \* \*

Q. Why was this clip collected?

A. *This clip shows the defendant and his friends* exiting the club and walking towards camera three.[46]

\* \* \*

Q. What's the time on this?

A. March 26, 2017, at 1:18 a.m. And *this will also pick up the defendant* and his group as they walk further down the sidewalk.[47]

\* \* \*

Q. When you see them enter the picture, can you point them to the jury, please.

A. Yes. *This is the defendant right here in the front with his shirt open, and he does not have a cowboy hat on.*

Q. Can you identify the people portrayed in the surveillance throughout the course of your investigation after talking to witnesses?

A. Yes. We were able to identify, out of that group of actually six that you'll see, we identified four of the individuals in that group.

Q. As they come into the picture, you can point them out to the jury and identify them.

A. Sure. This is Brian Saavedra right here with his back to the camera now (indicating). This is Carlos Saavedra right here (indicating). He's the brother of the defendant. This is Raul Hernandez here (indicating). And these are the two that we were not able to identify.[48]

---

[45] *Id.* (referring to State's Ex. No. 6).
[46] *Id.* (referring to State's Ex. No. 7) (emphasis added).
[47] *Id.* (referring to State's Ex. No. 7) (emphasis added).
[48] *Id.* (referring to State's Ex. No. 7) (emphasis added).

19

* * *

Q. Do you recognize anybody who you've met in the course of your investigation in this clip?

A. Yes. This is Madelyn Aramiz right there with her back towards the camera (indicating).[49]

* * *

MS. BRENNAN: And now, Your Honor, next is State's 10.

THE WITNESS: This captures – this is camera six. It's on March 26, 2017, at 1:20 a.m. This picks up that area that's been referred to as the grassy knoll. And it also picks up that side lot. And this is the defendant right here (indicating).[50]

Q. What are we watching here?

A. Lester Mateo has just brought the vehicle up. That's the Cadillac Escalade.

Q. Do you see the time and date?

A. Yes, It's March 26, 2017, at 1:20 a.m.[51]

* * *

MS. BRENNAN: Next, Your Honor, is State's 11.

Q. What's the time and date on this camera four view?

A. March 26, 2017, at 1:21 a.m.

Q. What's getting depicted in this clip at this point that it's stopped right here at 1:21 and nineteen seconds?

A. At the very far end of the building, Lester Mateo actually runs up into security. And one of the security guards actually grabs Lester, unknown as to what was occurring, and actually threw him down to the ground.[52]

* * *

---

[49] *Id.* at B9 (referring to State's Ex. No. 9).
[50] *Id.* (referring to State's Ex. No. 10).
[51] *Id.* (referring to State's Ex. No. 10).
[52] *Id.* (referring to State's Ex. No. 11).

Q.     As the clip plays, can you tell the jury what we are watching?

A.     Sure.  Lester gets knocked down.  He gets up and runs out into the parking lot, and he's ultimately struck by Escalade.

Q.     Do you see the driver of the Escalade?

A.     Yes.  He flees, jumps over Lester's body, and then runs off down towards the side parking lot.

MS. BRENNAN:  And, Your Honor, last this clip is No 12 at 1:21:16 at March 26, 2017, from camera five.[53]

Q.     What are we about to watch, Detective Mauchin?

A.     You're about to watch that same collision between the Cadillac Escalade and Lester Mateo just from the different camera angle from camera five.[54]

                              * * *

Q.     How were you able to – I guess, where did you see the driver of the Escalade in this clip?

A.     In this clip I saw him – he ran past actually one of the security guards.

Q.     Was it from combining your views of both camera angles that you were able to tell that the person that was running in camera five was the driver?

A.     Yes.[55]

                              * * *

Q.     What are we looking at here?

A.     That would be the collision.  And that's *obviously a zoomed-in view of it.  That's the defendant exiting and jumping over the victim*, running down through the upper lot and then circling down to head down to the side lot.[56]

---

[53] *Id.* (referring to State's Ex. No. 12).
[54] *Id.* at B10 (referring to State's Ex. No. 12).
[55] *Id.*  (referring to State's Ex. No. 12)
[56] *Id.* at B11 (referring to State's Ex. No. 17) (emphasis added).

21

Thus, Detective Mauchin, with the aid of the video footage, walked the jury through a four-minute sequence of events that began with the two factions leaving El Nuevo Rodeo and concluded with the driver of the Escalade—later identified as Saavedra—fleeing the scene after running over Lester Mateo. It is important to emphasize here that Saavedra did not voice a single objection to any of the questions that prompted Detective Mauchin to describe what—and who, including Saavedra—the video depicted. And it is equally worth noting that Saavedra has not identified a single question asked by the prosecutor during this examination as an instance of misconduct.[57] Having reviewed the video clips carefully, we suspect that the absence of objections was likely the product of the ostensibly uncontroversial nature of Detective Mauchin's testimony—at least at that point in time.

Between Detective Mauchin's testimony on the first day of trial and his third round of testimony when he was recalled on the fourth day of trial, Saavedra's strategy apparently changed. In the interim, the State called twelve other witnesses, at least seven of which—including Ramirez-Recinos, DeLeon-Lopez, Castillo de

---

[57] Buried in a footnote on page 23 of Saavedra's opening brief is a contention that the last-quoted testimony above "compound[ed] the prosecutor [*sic*] misconduct and due process violation alleged here and reflects an egregious pattern. Alternatively, it is plain error." We fail to see how this question and answer, asked and answered several days before the prosecutor is alleged to have committed misconduct, made the subsequent conduct worse. To the contrary, Saavedra's apparent consent to the admission of this testimony on the first day of trial undermines his claim that the prosecutor's conduct on the fourth day of trial was improper. In any event, to the extent that Saavedra attempts to raise a claim of error in this footnote, we find that the claim has been waived. *See Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993) ("The failure to raise a legal issue in the text of the opening brief generally constitutes a waiver of that claim on appeal.").

Leon, and two members of the El Nuevo Rodeo security team—were in the nightclub and its parking lot as the events depicted in the video unfolded. For some reason, however, the prosecutor only displayed the video to one of these intervening witnesses—Brian Saavedra—for the purpose of identifying the relevant actors.[58] And Brian Saavedra, to the apparent surprise of the prosecution, was not entirely helpful.

Brian Saavedra acknowledged that he went to El Nuevo Rodeo with his cousins, Carlos and Elder Saavedra, on the night in question. He also admitted that he and Elder were involved in a fight, which led to their departure together from the club with security. Several different camera angles show Brian Saavedra interacting and walking with several other individuals after they were escorted out of the club; two are of particular interest. Brian Saavedra identified the one wearing a "sombrero,"[59] as his cousin Carlos. But it was Brian's hatless companion, shirt unbuttoned, bare chest exposed, and visibly agitated, whose identity was of paramount significance. For starters, this was the person that Detective Mauchin had already identified as "the defendant . . . with his shirt open," also noting that "he does not have a cowboy hat on."[60] And this person also appears to be the same

---

[58] Notably and as mentioned, however, Ramirez-Recinos was shown a still photo gleaned from a key video and identified the person with Brian and Carlos Saavedra as the person who started the fight inside the club.

[59] App. to Opening Br. at A55.

[60] *See* n.41, *supra.*

23

person whom another witness—Irwin Ramirez-Recinos—identified in a still photo[61] as the person who started the fight on the dance floor, i.e., Elder Saavedra. What is more, Brian's bare-headed companion bore more than a striking resemblance to the man who, post-collision, alighted from the Escalade and ran away—that is, the person responsible for Lester Mateo's death.[62] Yet despite Brian's admission that he left the club with Elder and clear video evidence that he was conversing and walking with the hatless person depicted in the video, when asked to identify that person, he claimed to be stumped.

As Detective Mauchin retook the stand for the third time, having identified the first time—without objection— Saavedra, Mateo and all the other key players as the tragic event unfolded on video, Saavedra's approach to how the prosecutor was employing the video evidence appears to have changed. While displaying yet another video clip, this one showing a number of people running away from the scene approximately ten seconds after the fatal collision, the prosecutor asked Detective Mauchin: "In reviewing the surveillance clip [State Exhibit 153] during your investigation, what did you notice helpful to your investigation?"[63] Saavedra did not object to this question at trial, nor does he tell us now how this question can be fairly characterized as prosecutorial misconduct. But Detective Mauchin's

---

[61] App. to Answering Br. at B21–22; *see also* State's Ex. No. 29.
[62] *Compare* State's Ex. No. 8 with State's Ex. Nos. 10, 12, and 29.
[63] App. to Opening Br. at A112.

response that "this shows the defendant and his cousin"[64] drew a prompt objection from Saavedra's counsel. After a sidebar, during which the prosecutor offered to rephrase his question, the court instructed Detective Mauchin and the jury:

> Detective Mauchin, I would ask you to refrain from making any type of identification of the defendant.
>
> Ladies and gentlemen, you should disregard Detective Mauchin's testimony stating that it was the defendant and his friends running away.[65]

After the instruction, the prosecutor appropriately followed up by asking the witness: "Detective, without commenting as to who we are seeing in this video, what did you notice happening on the screen that was helpful to your investigation?"[66] Detective Mauchin observed that the operator of one of the vehicles depicted in the video appeared to be "fleeing, along with other members of his party."[67]

This exchange was followed by more testimony from Detective Mauchin about some additional video and certain still shots taken from the surveillance video, depicting the scene and some of the individuals involved in the incident. As the State played the video admitted as State's Exhibit No. 18, the following exchange between the prosecutor and Detective Mauchin occurred:

---

[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.*

25

Q.     [W]hat are we looking at here?

A.     This is the individual who was identified by many of the witnesses as having engaged in the altercation inside the El Nuevo Rodeo, and this is him now backpedaling in that grassy area on Camera 6.

Q.     . . . And in reviewing this during the course of your investigation . . . if you can kind of narrate what we're seeing with regards to the tracking of this individual.

A.     Sure . . . So now he begins to walk down, and he will slowly start to walk towards the left, and he will actually—there's a vehicle there. It's like an SUV. He will actually lean up against that vehicle with his back on that vehicle.

Q.     . . . Now, out of all of the people that we just saw him walking among, is there anything unique that you notice about him in conducting your investigation?

A.     Well, the individual who witnesses have identified as being Brian Saavedra [the defendant's cousin], he is the individual who is directly in front of him squatting down.

Q.     And what about the person with the red circle around him initially, and still with the red circle around him?

A.     That is the individual who was identified as having engaged in the altercation inside the club.[68]

Despite the identifications embedded in this series of questions— identifications that are likely dependent upon hearsay statements and which clearly implicate Saavedra, albeit without calling him by name—the answers came in without objection. Finally, when Detective Mauchin's next answer once again identified a person in a video "signal[ling] to others" as "the individual who was

---

[68] App. to Answering Br. at B149.

26

identified as starting the altercation,"[69] Saavedra's counsel objected. When the trial judge sustained the objection, defense counsel apparently content, told the prosecutor that he could "continue to play [the video]."[70] But when Detective Mauchin's next answer referred to the individual "who started the trouble inside of the El Nuevo [Rodeo]," Saavedra's counsel made his second objection and requested a mistrial, claiming that Detective Mauchin, an experienced detective, was disregarding the court's earlier instruction.[71] The trial judge saw it differently:

> The request for a mistrial is denied. I think he is doing something different in this testimony and not disregarding my previous instruction. So you're correct that he's made an improper factual leap here for the jury, and I will instruct the jury to disregard that statement. But he's not doing what I previously instructed him not to do, which was identify that person as the defendant. So the objection is sustained. I'll instruct the jury that it's up to them to determine who gets into the vehicle and to disregard any testimony about who that person is . . . .[72]

The court, once again, instructed the jury:

> The objection is sustained. Ladies and gentlemen, . . . the factual issue of who gets into that vehicle, which person it is on the video, is up to you to determine in the course of this trial in your deliberations, and you should disregard any testimony from Detective Mauchin or any

---

[69] *Id.* at B150.
[70] *Id.*
[71] *Id.*
[72] *Id.*

27

other witness stating who actually gets into the vehicle. All right? Thank you.[73]

Though Saavedra did not object to the questions the prosecutor asked and does not argue now that the questions themselves were improper, he nevertheless claims that they amounted to prosecutorial misconduct. This contention hinges on Saavedra's assertion that the questions masked a hidden "purpose," which was "to elicit an improper identification of the Defendant by Detective Mauchin."[74] We reject Saavedra's invitation to impute a bad-faith motive to the prosecutor's questions, which, by and large, were so innocuous as to be viewed by Saavedra's trial counsel as unobjectionable.

To be sure, a prosecutorial tactic can amount to misconduct even in the absence of a timely objection; for that reason, we have plain-error review. But, as outlined in detail above, on the first day of trial, Saavedra acquiesced in Detective Mauchin's wholesale description of what and whom[75] was depicted in the numerous video clips that were introduced without objection and played for the jury. Saavedra's decision to allow the prosecution free rein to proceed in this manner during the early stages of trial undermines his contention that the prosecution's

---

[73] *Id.*

[74] Opening Br. at 19.

[75] For example, on the first day of trial, the prosecutor asked Detective Mauchin if he could "identify the people portrayed in the surveillance throughout the course of [his] investigation after talking to witnesses," and also instructed him, "[a]s they come into the picture, . . . to point them out to the jury and identify them. B8.

examination of Detective Mauchin on the last day of trial was out of bounds. In sum, in the context of the trial as a whole, we are not prepared to infer an improper purpose from the prosecutor's unobjectionably formulated questions.[76] Therefore, Saavedra's first prosecutorial misconduct claim fails.

This is not to say that we have no concerns about the use of lay opinion testimony by police officers to identify defendants from photographic or videographic images. Indeed, we reiterate—and urge our trial courts and bar to take heed of—the concerns we expressed most recently in *Thomas v. State*.[77] Before a law enforcement witness uses a video clip or photograph to identify the defendant, due caution should be exercised to ensure that a proper foundation is laid establishing, to the trial court's satisfaction, that the witness has a special familiarity with the defendant that would put him in a better position than the jury to make the

---

[76] Our conclusion that the prosecutor's examination of Detective Mauchin did not constitute prosecutorial misconduct does not mean that we view the examination as flawless. Although asking a witness to narrate a video is not impermissible *per se*, *see, e.g.*, *United States v. Begay,* 42 F.3d 486, 502–503 (9th Cir. 1994), *cert. denied sub nom. MacDonald v. United States*, 516 U.S. 826 (1995), it is fraught with evidentiary peril. In particular, questions that call for a witness to provide an unbounded narrative response are likely to elicit responses that contain objectionable evidence before opposing counsel can object. Counsel is then relegated to the unenviable position of making a well-founded objection after the jury has heard the inadmissible testimony. A motion to strike, under such circumstances, is not the equivalent of a timely objection. And here the prosecutor at one point explicitly asked Detective Mauchin to narrate as a video was played. A28. ("As [this video—Exhibit No. 13] is played, please feel free to narrate as to what we are watching."). But Saavedra's counsel did not object to this question nor does his prosecutorial misconduct claim cite it as improper.
[77] 207 A.3d 1124 (TABLE), 20189 WL 1380051 (Del. March 26, 2019).

29

identification.[78]  And in determining whether the witness occupies such a position, the court should also consider whether the images from which the identification is to be made "are not either so unmistakably clear or so hopelessly obscure that the witness is no better suited than the jury to make the identification."[79]

But the claim before us now is not that the trial court erroneously permitted Detective Mauchin to identify Saavedra using the video images that were equally available to the other witnesses and the jury.  Instead, we have been presented with a record that shows an uncontested examination of the chief investigating officer on the first day of trial in which the key actors were identified—without objection—in the video footage the jury was watching.  The prosecutor and the court could reasonably assume, based on the absence of an objection, that the identity of the person depicted on the video, separate and apart from whether Saavedra can be seen getting in or out of the Cadillac Escalade, was not a contested fact.  But Saavedra would now have us hold that the same form of questions asked three days later was

---

[78] *U.S. v. Jett*, 908 F.3d 252, 271–72 (7th Cir. 2018) ("Under [F.R.E.] Rule 701, a witness can match a defendant to surveillance footage only if there is a basis for concluding that the witness 'is more likely to correctly identify the defendant from the photograph than is the jury.'") (quoting *U.S. v. White*, 639 F.3d 331, 336 (7th Cir. 2011)); *U.S. v. Rodriguez-Adorno*, 695 F.3d 32, 40 (1st Cir. 2012) ("[W]here the witness is in no better position than the jury to make an identification, such testimony does not meet the requirements of Federal Rule of Evidence 701 and is inadmissible."); *State v. Lazo*, 209 N.J. 9, 22–24 (N.J. 2012) (noting that "when there is no change in a defendant's appearance, juries can decide for themselves—without identification testimony from law enforcement—whether the person in the photograph is the defendant sitting before them").

[79] *U.S. v. Jackman*, 48 F.3d 1, 4–5 (1st Cir. 1995).

not merely objectionable, but amounted to prosecutorial misconduct. That we are not prepared to do.

## B. *Enhanced Video*

Saavedra's opening brief devotes one short paragraph to his contention that one of the video clips[80] was improperly enhanced by placing a red circle around the individual who Detective Mauchin identified as the Defendant so that his movements could be tracked. Saavedra claims that the State employed this technique because one of the most important segments of the clip was, because of distance and darkness, of "poor quality."[81]

It is unclear to us whether Saavedra intends this claim, which he did not raise when the video was played at trial, to be a separate misconduct claim or a factor to be considered in our assessment of the propriety of Detective Mauchin's identification testimony. Under either framework, Saavedra's argument is unavailing for one simple reason: the red circle does not enhance the images on the video;[82] it merely directs the viewer to the place on the video that was the subject of the witness's testimony, much as a laser pointer would do. It remained, as the trial

---

[80] State's Ex. No. 18.
[81] Opening Br. at 27 n.92.
[82] We do not mean to suggest—and Saavedra does not appear to argue—that enhancing video evidence is, in and of itself, impermissible.

31

court instructed, for the jury to decide what and whom could be seen within the red circle.

Having rejected Saavedra's claim that the prosecutor engaged in prosecutorial misconduct, we need not assess whether the alleged misconduct affected the fairness of Saavedra's trial. Nevertheless, we note that, even had we come down on Saavedra's side and concluded that the prosecutor's examination of Detective Mauchin was improper, we would conclude that the error was harmless.

Taking the *Hughes* harmless-error factors in turn, the case against Saavedra was not particularly close. It was undisputed that Saavedra instigated the dance-floor altercation and threatened the lives of Mateo's group. Madelyn Aramiz identified Saavedra in a photographic lineup as the person who jumped out from behind the wheel of the Cadillac Escalade after it struck Mateo. Saavedra's actions to evade detection and arrest provided evidence of a consciousness of guilt. But most telling was Saavedra's admission to his former girlfriend that, "on the night of the [R]odeo . . . he got possessed by the devil and killed somebody . . . ."[83] What is more, a careful review of the video unaided by Detective Mauchin's testimony, which this Court has undertaken, the still shots of the driver exiting the Escalade, and the testimony of Ramirez-Recino, Castillo de Leon, and De Leon-Lopez, leaves little room for doubt that Saavedra drove the Escalade into Mateo. When that

_____

[83] App. to Answering Br. at B117.

evidence is considered together with Aramiz's identification and Saavedra's flight and eventual confession, even that slightest of doubts vanishes.

The second *Hughes* factor, the centrality of the issue affected by the purported error could be seen as favorable to Saavedra's position only because the identity of the driver was really the *only* issue in the case. But, as noted, Detective Mauchin was not the sole person or evidence that put Saavedra behind the wheel; the other witnesses and video evidence would have been sufficient to do so on their own.

And finally, we are satisfied that the trial judge took sufficient steps to mitigate any mischief that might have attended Detective Mauchin's testimony. In the immediate wake of the two instances of misconduct specifically identified by Saavedra, the trial judge gave curative instructions. Following the first instance, the court instructed the jury to "disregard Detective Mauchin's testimony stating that it was the defendant and his friends running away."[84] And after the second—this time after over-ruling Saavedra's request for a mistrial—the court instructed the jury to disregard the detective's testimony during a video display, identifying "the individual who started the trouble inside El Nuevo" as the person "entering the vehicle" that shortly thereafter ran over Mateo. In her instruction, moreover, the trial judge emphasized that it was the sole province of the jury to determine the identity of the driver. In the context of Saavedra's trial, these instructions were

---

[84] App. to Opening Br. at A112.

33

meaningful and practical steps taken in response to Saavedra's concerns and mitigated any prejudicial effect the detective's testimony may have caused.[85]

Saavedra's claim fares no better under a proper application of the *Hunter* test. His argument under *Hunter* is not only conclusory—it merely announces that the prosecutor's misconduct casts doubt on the integrity of the judicial process without explaining how it does so—but it is also based on a misunderstanding of the type of repetitive error and "persistent pattern of misconduct"[86] that *Hunter* was meant to address. In *Hunter*, we identified a persistent pattern of misconduct because the prosecutor's improper comments "cover[ed] several of the specific categories of comment that have been prohibited *in past decisions*."[87] Thus, in applying *Hunter* we are attempting to "provide safeguards against a repetition of the same type of specific conduct that ha[s] been held to be error [in prior decisions], *albeit* harmless error."[88] We do not look, as Saavedra's asks us to, to the repetition of errors within a specific trial, but repetition of the same errors over multiple trials, which reflects a disregard of our prior admonitions and thus impugns the integrity of the judicial

---

[85] *See Justice v. State*, 947 A.2d 1097, 1102 (Del. 2008) (A trial judge's prompt curative instructions are presumed to cure error and adequately direct the jury to disregard improper statements. A curative instruction is a meaningful or practical alternative to declaring a mistrial, and juries are presumed to follow the instruction.) (quotations and footnotes omitted).

[86] *Hunter*, 815 A.2d at 738.

[87] *Id.* (emphasis added). Thus, *Hunter* is meant to address prosecutorial behavior that we have disapproved of in the past, but continues to persist in other trials.

[88] *Brokenbrough v. State*, 522 A.2d 851, 864 (Del. 1987) (emphasis in original).

process.[89]  Because Saavedra has not described this type of pattern or repetition, his argument under *Hunter* fails.

Thus, even if the jury should not have heard Detective's Mauchin's narrative testimony, the fact that it did is harmless.  It follows that, to the extent that Saavedra did not object to portions of that testimony, the admissions of those portions was not plain error.

### C.  Lay Opinion Testimony

In addition to identifying Saavedra as the person who alighted from the Escalade after it struck and killed Mateo, Madelyn Aramiz also testified that, before fleeing, Saavedra said "la migra," which she translated to mean "immigration."[90] The State then introduced testimony, over Saavedra's objection, from Trooper Kelly Diaz, who assisted Detective Mauchin in the investigation of this case, that "la migra" had a special meaning in Hispanic communities.  Trooper Diaz claimed to know that meaning because he grew up in a "mostly Hispanic"[91] neighborhood. According to Diaz, who confirmed that "la migra" means "immigration,"

> [t]hrough [his] experience living in apartment complexes, especially in
> Hispanic populations, any time the police or the feds are coming and
> people yell "La Migra," they say that so that everybody scatters and

---

[89] In so holding, we recognize that we have from time to time and at the urging of the defendant reviewed *Hunter* claims with reference to repetitive errors within a single trial.  We do not see those cases as altering the proper focus of our review under *Hunter*, which is on whether our prior judicial admonitions short of reversal are falling on deaf ears.

[90] A69–70.

[91] A84.

they leave as quick [sic] as they can so they're not picked up by police or the feds.[92]

Saavedra objected on the grounds of relevance and because the translation with commentary was in the nature of expert testimony.[93]  The State countered that the challenged statement was not expert testimony but, rather, was permissible opinion testimony from a lay witness permissible under Rule 701 of the Delaware Rules of Evidence ("D.R.E.").  The Superior Court agreed with the State, overruling Saavedra's objection.  We now review this evidentiary ruling for abuse of discretion.[94]

D.R.E. 701, which governs opinion testimony by lay persons, provides that:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is;
(a)  Rationally based on the witness's perception;
(b)  Helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
(c)  Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Saavedra contends that Trooper Diaz's testimony was not admissible under this rule because it was not based on Diaz's perception under subsection (a) but, instead, relied on the perception of the witness—Madelyn Aramiz—who claimed to have heard Saavedra cry "la migra."  The State counters that Trooper Diaz's

---

[92] A84–85.

[93] Although this is not clear from the trial record, Saavedra has represented in its opening brief that the State did not disclose in discovery that Trooper Diaz would testify as an expert.

[94] *Seward v. State*, 723 A.2d 365, 372 (Del. 1999).

testimony about the meaning of those words was rationally based upon his personal experiences growing up in a Hispanic neighborhood and helpful to the jury's understanding of what Aramiz heard. Therefore, the State argues that the testimony was admissible under D.R.E. 701. In the alternative, the State claims—contrary to what it argued in the Superior Court—that Diaz's testimony was admissible expert testimony under D.R.E. 702. Not surprisingly, Saavedra responds that the State waived its right to invoke D.R.E. 702 when it announced to the Superior Court that "this is not expert testimony."[95]

Both sides miss the mark, each in their own way. The State's attempt to shoehorn Trooper Diaz's testimony into D.R.E. 701's ambit is based on an incomplete reading of the rule that omits subsection (c). Specifically, though the State addresses whether the opinion was rationally based on Diaz's knowledge and helpful to determining a fact in issue, it does not say—other than making the alternative argument it eschewed below—how the opinion is "[n]ot based on . . . other specialized knowledge within the scope of Rule 702."[96] Saavedra's argument that Trooper Diaz's testimony is not based on his personal knowledge under subsection (a) also misses the point, because it conflates his testimony about what Aramiz said she heard from Saavedra's mouth with Trooper Diaz's

---

[95] App. to Opening Br. at A79.
[96] D.R.E. 701(c).

interpretation of those words. The challenged opinion is the interpretation, which was clearly based on Diaz's experience in the neighborhoods of his youth—a form of specialized knowledge—and not Aramiz's recollection of what Saavedra said before he fled.

We therefore tend to think—without deciding—that the Diaz testimony was in fact based on specialized knowledge, violating subsection (c), and should have been offered under D.R.E. 702. But we need not address that distinction nor need we surmise how the Superior Court would have ruled had it been so offered in light of the State's apparent failure to disclose Trooper Diaz's expert status during pretrial discovery. We can avoid those questions because, however debatable the admission of Diaz's testimony under D.R.E. 701 might be, any error was harmless.

First and foremost, it is difficult to discern what prejudice Saavedra suffered because the jury heard Trooper Diaz's opinion that "la migra" is a catch-phrase that implores those who hear it to scatter, given that Saavedra himself was in flight. But even if the phrase bore some negative connotation that was separate and distinct from Saavedra's observed conduct, the error would still be harmless. In this regard, we have held that "an error in admitting evidence may be deemed to be 'harmless' when 'the evidence exclusive of the improperly admitted evidence is sufficient to

sustain a conviction.'"[97]  And here, setting aside Trooper Diaz's testimony, there is ample evidence, including the video evidence and eyewitness identifications described above and Saavedra's confession to Mariela Conejo-Centura that "on the night of the rodeo . . . he got possessed by the devil and killed somebody . . .,"[98] to sustain Saavedra's convictions.

### D.  The Prosecutor's "Implied Assertion"

Saavedra's final claim again charges the prosecutor with misconduct that undermined the fairness of his trial, this time in connection with the prosecutor's direct examination of Brian Saavedra.  As mentioned earlier, Brian admitted that he went to El Nuevo Rodeo with Elder and Carlos Saavedra and that the three were escorted out of the club because of the fight in which he and Elder were participants.  He also acknowledged that one of the surveillance video clips[99] showed him, Carlos, and a friend, Raul, walking away from the club.  But when asked to identify "the person with the shirt unbuttoned"[100]—a person with whom he was clearly interacting and who had been identified from a still photo as the person who started the fight inside—Brian said that he did not know who that was.

Brian's answer prompted the following exchange:

---

[97] *Cooke v. State*, 97 A.3d 513 (Del. 2014) (quoting *Nelson v. State*, 628 A.2d 69, 77 (Del. 1993)).
[98] App. to Answering Br. at B121.
[99] State's Ex. No. 8.
[100] App. to Answering Br. at B35.

Q. Do you remember ever speaking with any member of the Delaware State Police about this surveillance video?

A. Yes.

Q. And do you remember speaking with both of these officers about who was in these surveillance videos?

A. Um-hmm.

Q. When you spoke with these officers, did you come in voluntarily?

A. They came to my house.

Q. Do you remember coming into offices and speaking with these officers?

A. Yes[101]

*  *  *

Q. And when you spoke with the troopers with Trooper Diaz acting as an interpreter, do you recall whether or not you were able to say who that person in the surveillance without the hat on was?

A. No.

Q. You don't remember that?

A. Yes. I remember I said that I didn't know who it was.

Q. That you did not. And you don't remember giving these troopers the name of the individual who was seen walking without the sombrero on?

A. No.[102]

Saavedra now contends that the last question in this series "was a deliberate attempt to create an impression on the jury that Brian Saavedra previously identified

---

[101] App. to Opening Br. at A56–57.
[102] *Id.* at A57–58.

the defendant in a video clip when he met with the police, despite his multiple denials."[103] According to Saavedra, the prosecutor's question contained an implied assertion of a prejudicial fact, which the State was not prepared to prove through other evidence. This, he says, "constitutes misconduct and violates due process."[104]

Saavedra further contends that the prosecutor made matters worse by mischaracterizing Brian's testimony in closing argument, when he told the jury:

> And even Brian Saavedra *somehow identified him by not identifying him*, because Brian Saavedra, the defendant's cousin, came in and testified: That's me wearing a hat, and that's Carlos wearing a hat. And the three of us came together, but we didn't—we left together, but, yet, suddenly wouldn't say—said he didn't know who that person is, despite witnesses telling you over and over again that that person not wearing the hat, the person in a fit of rage, is the defendant, his cousin, who he sees every day, his cousin who was pepper sprayed and did tell you that the defendant was able to drive home because he was not.[105]

Because defense counsel did not raise a timely objection to either instance of alleged prosecutorial misconduct and the trial judge did not intervene *sua sponte*, we review this claim for plain error.[106] Of course, as with the prosecutorial claims discussed earlier, if we determine that no misconduct occurred, our analysis ends there.

---

[103] Opening Br. at 48.
[104] *Id.*
[105] App. to Opening Br. at A115 (quoted and emphasis added in Opening Br. at 47).
[106] *Baker*, 906 A.2d at 148.

It would have been improper for the State "to ask a question which implie[d] the existence of a factual predicate which the [prosecutor] [knew] he [could not] support by evidence."[107] This standard has been read to prohibit questions implying factual predicates for which the examiner "has no reason to believe that there is a foundation of truth."[108] Here, the record reflects that the prosecutor had a sound reason to believe that the implied factual predicate of her question—that Brian Saavedra had been able to identify the individual on the video in an earlier statement—was true. And she disclosed that reason at a sidebar conference immediately following the question, advising the court that Brian had previously made the identification in Trooper Diaz's presence during trial preparation.[109] Her plan at that point was to call Trooper Diaz to testify under 11 *Del. C.* § 3507[110] to the substance of Brian's earlier statement, but that never happened.

To be sure, testimony from Trooper Diaz concerning Brian's prior out-of-court identification would have eliminated any purported prejudice created by the

---

[107] ABA Standard Relating to the Administration of Criminal Justice, The Prosecution Function §5.7(d).

[108] *United States v. Harris*, 542 F.2d 1283, 1307 (7th Cir. 1976).

[109] We note that Saavedra, in his opening brief on appeal, claims that his defense counsel disputed the existence of the § 3507 statement during the side bar conference. We read the record differently. Saavedra's counsel's side bar protest appears to have been focused solely on the absence of notes reflecting Saavedra's prior statements. *See* A61. ("I understand that goes to the weight, . . . not the admissibility. I'm just asking if there are notes.").

[110] Under 11 *Del. C.* § 3507, "[i]n a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value."

42

factual predicate that Saavedra claims was embedded in the prosecutor's questions. But we cannot ignore the fact that Saavedra's counsel did not object or challenge in any meaningful way the factual predicate for the questions. Had there been a timely objection, it would have been within the Superior Court's discretion to require the prosecutor to establish the factual predicate, which, based on the prosecutor's representations at the side bar conference, could have been easily accomplished. Under these circumstances, we cannot conclude that the challenged questions amounted to prosecutorial misconduct.

Nor are we persuaded that the prosecutor's closing argument mischaracterized Brian Saavedra's testimony. To the contrary, we understand the State's argument to have been that the jury could infer that Brian left the nightclub with Elder and Carlos Saavedra and that the man Brian claimed he could not identify was his cousin, Elder—from Brian's testimony, from what the jury themselves saw on the video, and from what numerous other witnesses had said. Arguing from the evidence that a witness's testimony—here, Brian Saavedra's answer that he could not identify the hatless person in the video—lacks credibility is not prosecutorial misconduct.

## V. CONCLUSION

The judgments of conviction of the Superior Court are affirmed.

43